WILLIAMS CUKER BEREZOFSKY
Mark R. Cuker, Esq. (NJ ID 9211987)
Joseph Alan Venti, Esq. (NJ ID 031742008)
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163
(856) 667-0500

CEDAR LAW FIRM
David Cedar, Esq.
1908 Marlton Pike East
Cherry Hill, NJ 08003
(856) 874-7500                                    *Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| JEANNIE MINIX and CHELSEA MINIX and HALEY MINIX | : : : : : **Civil Action No.** : |
| Plaintiffs | : : |
| v. | : **Jury Trial Demanded** : |
| SOLVAY SPECIALTY POLYMERS USA, LLC; and ARKEMA, INC., | : : : : |
| Defendants. | : |

## I.      NATURE OF ACTION

1.      This is a civil action for compensatory and punitive damages, including medical

monitoring and costs incurred and to be incurred by Plaintiffs arising from the intentional,

knowing, reckless and negligent acts and omissions of Defendants Solvay Specialty Polymers,

USA, LLC( "Solvay") and Arkema, Inc. (collectively, "Defendants") resulting in the

contamination of human drinking water supplies used by the Plaintiffs.  The contamination was

caused by Defendants' manufacturing, use, discharge and/or disposal of perfluorinated materials

including C-4 through C-16, fluoropolymers and fluorotelomers (hereinafter "PFCs") at and/or otherwise attributable to the plant in West Deptford Township, New Jersey.

## II.    PARTIES, JURISDICTION, AND VENUE

2.    Defendant Solvay Specialty Polymers, USA, LLC is a Delaware corporation with its principal place of business at 4500 McGinnis Ferry Road, Alpharetta, Georgia 30005.  Its principal officers are George Corbin (President and CEO) and Maureen Carl (Vice President), both of whom are citizens of Texas who work at 3333 Richmond Avenue, Houston, Texas 77098.  Solvay Specialty Polymers, USA, LLC is a wholly-owned subsidiary of Solvay S.A., a *société anonyme* organized under the laws of Belgium with principal place of business in Brussels, Belgium.

3.    Solvay owned and operated a manufacturing site at 10 Leonard Lane in West Deptford Township, Gloucester County, New Jersey (the "Facility").  The site encompasses 243 acres and is known to be contaminated with PFCs.

4.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, Pennsylvania 19103.

5.    Arkema is the corporate successor to Pennwalt Limited ("Pennwalt") and Elf Atochem North America who owned and operated the Facility until 1990.  Elf Atochem sold the site to Ausimont USA in 1990 and Solvay acquired the site with its acquisition of Ausimont USA in May 2002.

6.    Plaintiffs are citizens of the State of New Jersey.  Plaintiffs all reside in West Deptford, New Jersey at 965 Kings Highway.

7.     Plaintiff Jeannie Minix is the mother of Plaintiffs Chelsea and Haley Minix and the three of them have continuously resided at 965 Kings Highway for approximately three years.

8.     Plaintiff Jeannie Minix is the owner of the home at 965 Kings Highway, which has a private well which is used for its domestic water supply.

9.     Jurisdiction is based on diversity of citizenship under 28 USC § 1332(a) because this case is between citizens of different States and the amount in controversy exceeds $75,000 per person.

10.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims raised in this action occurred in this district, and alternatively because a substantial part of property that is the subject of this action is situated in this district.

### III.     DEFENDANTS' CONTAMINATION OF THE WATER SUPPLY

11.     Pennwalt used PFCs at the Facility since the 1970s to produce polyvinylidene fluoride ("PVDF") resin.  Solvay and its predecessors continued to use PFCs, including perfluoro octanoate acid ("PFOA") as well as other long-carbon-chain PFCs, to produce PVDF at the site until 2010, at which time the use of PFCs was phased out pursuant to an agreement with the United States Environmental Protection Agency ("EPA").

12.     In addition to PFOA, among the PFCs used and discharged at the site by the Defendants was perfluorononanoic acid ("PFNA"), and as a result of Defendants' actions both PFNA and PFOA have been detected in high concentrations in Plaintiffs' private well.

13.     Plaintiffs were recently informed that their well is contaminated by PFCs, including PFNA at a level of 0.12 ug/l and PFOA at a level of 0.016 ug/l.

3

14.     In 2002, specifically, the Facility was the second-highest-capacity plant in the world (behind only a facility in Calvert City, Kentucky) in terms of quantities of PFNA used as a processing aid for the PVDF emulsion process.

15.     Data provided to the New Jersey Department of Environmental Protection ("DEP") about PFC use at the Facility indicate that 86.6% of the 125,069 kg of Surflon S-111 PFC mixture (which is primarily PFNA) used between 1991 and 2010 was released into the environment (*i.e.*, the surrounding air and water).

16.     Defendants improperly disposed of PFCs on the actual plant site, contaminating the groundwater immediately beneath the Facility.

17.     The Facility's on-site monitoring wells show the groundwater to be contaminated by PFCs at levels as high as 48.2 ppb  on site, and from 2.68 to 26.8 ppb offsite.  When compared to DEP's interim proposed guidance level of .02 ppb, this data shows that Defendants heavily contaminated the acquifer with PFNA and other PFCs in use at the Facility, PFCs which have, in turn, contaminated Plaintiffs' well water.

18.     EPA has recognized long-chain PFCs such as PFOA and PFNA as emerging contaminants of concern.  Because these are long-chain molecules, they are bioaccumulative in humans and very persistent in the environment.  When PFC contamination was found widespread in West Virginia, a science panel concluded that there was a probable link between exposure to PFCs (including PFOA (C8)) and kidney cancer, testicular cancer, thyroid disease, pregnancy induced hypertension, ulcerative colitis, and high cholesterol in blood.

19.     In addition, recent studies of PFCs show that PFNA has immunotoxic effects in

mice (which share 99% of human DNA and which are regularly used as predictive models for adverse effects in humans) and causes other effects in animals such as liver toxicity, damage to the spleen, weight loss, lymphoid organ atrophy, decreased survival and developmental effects in offspring, and male-specific reproductive toxicity.

20.      It has been estimated that up to several metric tons of PFNA were emitted yearly at the Facility for well over a decade.

21.      PFCs like PFNA cannot be removed from drinking water by conventional water treatment processes; reliance on systems using, for example, granular activated carbon, reverse osmosis, or ion exchange treatment are instead necessary.

22.      In or around May 2014, Solvay delivered to private-well owners in the West Deptford area a flyer from the New Jersey Department of Health titled "Drinking Water Facts:  Perfluorinated Chemicals (PFCs)."  The flyer notes that "PFCs have been associated with a variety of adverse health effects in humans"; that "drinking water may be a major source of exposure to PFCs for people living in communities with contaminated drinking water"; that "[s]tudies of the general population, communities with drinking water exposures, and exposed workers suggest that PFCs increase the risk of a number of health effects" including "increases in cholesterol and uric acid levels"; that "PFOA and PFOS caused tumors in rodent studies"; that "[i]n a community exposed to PFOA through drinking water, individuals with higher PFOA blood concentrations had increased risk of kidney and testicular cancer"; and that "[i]n experimental animals, PFCs cause developmental effects.  In humans, exposure to PFCs before birth or in early childhood may result in decreased birth weight, decreased immune responses, and hormonal effects later in life."

5

23.     When Defendant Solvay later informed the plaintiffs of the results of their private well test it did not frankly and honestly disclose the severity of the problem.  Instead, Solvay flagrantly understated the severity of the health threat, using statements such as "PFCs, including PFNA are not regulated in drinking water but their occurrence is being studied to determine if future regulation is needed" and "the DEP is not aware of any studies that have directly linked the consumption of water with PFA with any adverse human health effects."

24.     Solvay's letter, attached hereto as Exhibit A, was misleading to plaintiffs and similarly situated homeowners as it never tells them they are facing a serious risk to their health. It starkly contrasts with the statements by the DEP in its March 2014 Interim Groundwater Criteria Document for PFNA ("DEP white paper") which concluded that levels of PFNA above 0.02 ug/l pose a risk to human health.  The level found in plaintiffs' water, 0.12 ug/l is six times the level the DEP recommends as sufficiently protective of human health.

25.     Solvay's letter is also misleading because it states that "our investigation will seek to identify possible sources of PFNA and other PFCs found in the sampled area."  In fact, because Solvay used uniquely large volumes of PFNA relative to other facilities in the area, it is virtually certain that most, if not all, of the PFNA found in plaintiffs' well came from Solvay.

26.     Since at least the 1980s, companies like Defendants who used or generated PFCs in their manufacturing processes have known that PFOA emissions and/or releases into the air, groundwater, and surface water from their facilities could harm surrounding communities through contamination of public drinking water supplies near their facilities.  Despite this knowledge, Defendants have not taken adequate steps to sample or analyze public or private water near the Facility to determine whether those supplies also are contaminated with PFOA or any other PFCs.

6

27.     Despite knowledge since at least the late 1970s that humans exposed to perfluorochemicals, including PFOA and PFNA, would accumulate elevated levels of these chemicals in their blood, and despite knowledge since at least 2004 that exposure to even part-per-trillion levels of PFOA in community drinking water could result in significantly elevated levels of such chemicals in blood of the general population drinking water, Defendants did nothing to abate their pollution, warn the community or test the residents for exposure.

28.     PFCs are produced synthetically; they do not naturally occur in the environment.

29.     During the production, synthesis, recycling and disposal of PFCs, due care must be exercised at all times to avoid the release or discharge of PFCs into the environment.

30.     Once released, PFCs are persistent in the environment.  The destruction of certain PFCs only occurs through high temperature incineration.

31.     Certain PFCs are not known to ever break down in water, soil, air or the human body.

32.     PFCs (including PFOA and PFNA) attributable to releases from the Facility have contaminated the air, soil, biota, surface water (including the Delaware River), groundwater, sediments and public and/or private human drinking water supplies/sources located on or near the Facility.

33.     Those PFCs are subject to atmospheric dispersion associated with the prevailing wind patterns.  This dispersion results in human exposure both on-site and off-site of the Facility.

34.     Because PFCs are not naturally occurring substances, all PFCs found in human blood serum and/or plasma are attributable to human activity.

35.     The EPA has noted that PFOA presents developmental and reproductive risks to humans; it has also noted the results of a retrospective mortality study on certain employees at a

7

3M plant in Minnesota, which study associated PFOA exposure with an increased likelihood of cerebrovascular disease mortality.

36.     In February 2006, EPA's Science Advisory Board's PFOA Review Panel ("SAB Panel") issued a report recommending that EPA revise its description of PFOA's human cancer relevance to reflect the fact that PFOA meets the criteria for characterization as a "likely" human carcinogen.

37.     The SAB Panel has indicated that they would recommend, based on animal studies, limited human occupational epidemiological studies, and other scientific data, that EPA's PFOA risk assessment address a variety of potential adverse health effects in humans, including liver, testicular, pancreatic, and mammary or breast cancer; liver histopathology other than liver cancer; alteration of lipid metabolism; immunotoxicity and effects on hormonal systems; developmental effects; and neurotoxicity and effects on the behavioral functions.

38.     DEP's March 2014 white paper notes that cross-sectional studies of the general population shows associations between blood serum PFNA levels and increased cholesterol in adults, increased glucose and related parameters in adolescents, diabetes in the elderly, decreased response to rubella vaccine in children, increased thyroid horomone levels in children, and behavioral effects in children.  The existence of PFNA, PFOA, PFOS and PFHxS in blood serum were each associated with increased risk of ADHD in children and increased incidences of asthma, and PFNA specifically was associated with a significant decrease in performance of a task assessing response inhibition.

39.     Exposure to PFNA causes its distribution to the blood, liver and kidneys, and it is transferred from mothers to their children through (1) the umbilical cord during pregnancy; and (2) through breastfeeding after birth.

40.     PFCs, including PFNA, have also been associated with enlargement of the liver in laboratory animals, as well as other adverse effects on the liver, the kidneys, and the metabolic and immune systems of those animals.

41.     For many years Defendants knew or should have known that releases of PFCs, including PFOA and PFNA, from the Facility have contaminated (and continue to contaminate) the drinking water utilized by the Plaintiffs and other nearby residents.

42.     In spite of their knowledge, which was far superior to that of Plaintiffs, Defendants negligently, carelessly, wrongfully, recklessly and/or intentionally has failed to advise and/or warn citizens living and/or working in the area surrounding the Facility about the presence of PFCs in their drinking water and failed to fully and accurately disclose the true toxicity risks and bioaccumulation risks associated with those chemicals.

43.     Defendants negligently, carelessly, wrongfully, recklessly and/or intentionally failed to take appropriate steps to try to reduce the levels of PFCs, including PFNA and PFOA, in the drinking water consumed by the Plaintiffs.

44.     Plaintiffs have consumed and ingested water from the Water Supply and are at an increased risk for real and present physical and biologic injury (including, but not limited to, blood and/or bodily contamination via PFCs and/or sub-cellular damage).

45.     There is a causal link between exposure to PFCs, including PFNA and PFOA, and subclinical or subcellular injury and/or serious latent human disease.

46.     The demonstrated health effects of PFNA and other PFCs used at the Facility on laboratory animals demonstrates that the PFC contamination of the Water Supply may present an imminent and substantial endangerment to the health and safety of the public, Plaintiffs included.

9

47.     The increased risk of serious latent diseases and other harms referred to above makes it reasonably necessary for Plaintiffs to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

48.     Monitoring procedures exist that make possible the early detection of the latent diseases and other harms referred to in the above paragraphs.

49.     The contamination of the plaintiffs' well water supply has severely disrupted the lives of Plaintiffs and their children. They have and will incur substantial costs for bottled water in order to reduce their exposure to the contaminants in the public water supply. They have and will be subjected to annoyance, inconvenience and distress in having to make repeated trips to pick up bottled water, and to use bottled water instead of tap water for such ordinary tasks as cooking, making coffee or tea, watering their vegetable garden and feeding pets.

## IV.    CLAIMS

## COUNT I - NEGLIGENCE

50.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

51.      Defendants had, and continue to have a duty to operate and manage the Facility and its related wastes in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

52.     Defendants breached their duty of care by negligently operating and managing the Facility and conducting other activities there so as to cause or allow the release of PFCs into the environment, thereby contaminating plaintiffs' well.

10

53.     Defendants' negligent acts and omissions caused and continue to cause damage to Plaintiffs through contaminating their blood and/or body with PFCs and/or causing sub-cellular damage, in addition to endangering health and the environment.

54.     As a result of these acts and omissions, Defendants and those acting for and on their behalf contaminated the environment with PFCs, which were consumed by Plaintiffs, who were injured as a result thereof.

55.     The acts and omissions of Defendants were negligent, and as a result, Plaintiffs have suffered and/or will in the future suffer damage in the form of bodily injury, emotional distress, and/or property damage all of a type not common to the general public, for which Defendants are liable, including, liability for all medical monitoring relief required by Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against defendants jointly and severally, and asks the Court to award each of them compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT II - GROSS NEGLIGENCE, RECKLESS, WILLFUL AND WANTON CONDUCT

56.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

57.     At all times pertinent hereto, the conduct of Defendants in causing, permitting, and allowing the release of one or more PFCs into the environment, thereby contaminating the drinking water of Plaintiffs, constitutes an entire want of care and conscious indifference to the rights, welfare, safety, and health of Plaintiffs, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

11

58.     Defendants' grossly negligent conduct proximately caused and continues to proximately cause damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage) and property damage, in addition to creating conditions harmful to human health and the environment.

59.     Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiffs and a reckless indifference to their welfare.

60.     Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of the Plaintiffs so as to warrant the imposition of punitive damages.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against defendants jointly and severally, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT III - PRIVATE NUISANCE

61.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

62.     Defendants' acts and omissions with respect to the releases of one or more PFCs has unreasonably interfered with Plaintiffs' use and enjoyment of their property, invading Plaintiffs' homes and bodies, making Plaintiffs' water supply unfit for domestic purposes and consumption and placing Plaintiffs at an increased risk of developing serious latent diseases.

63.     The contamination of Plaintiff's well has materially diminished the value of their property.

64.     Defendants' unreasonable interference with the use and enjoyment of Plaintiffs' property constitutes a continuing private nuisance.  As a result of the acts and omissions of Defendants as alleged in this Complaint, Plaintiffs have been and will be greatly annoyed and

12

inconvenienced, have suffered and will suffer fear, humiliation and/or embarrassment and have been and will be otherwise damaged as alleged in this Complaint.

65.     Defendants' creation of a continuing private nuisance has damaged Plaintiffs in the form of bodily injury, emotional distress, and/or property damage all of a type  not common to the general public, for which Defendants are liable, including liability for all appropriate medical monitoring relief required by Plaintiffs.

WHEREFORE, Plaintiffs' demand the entry of a court order compelling Defendants to (1) provide alternate water supplies; (2) provide treatment Plaintiffs' well water to remove the chemical contamination they caused; (3) provide testing to determine the level of PFCs in Plaintiffs' bodies.

## COUNT V - PAST AND CONTINUING TRESPASS

66.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

67.     Defendants' intentional acts and/or omissions have resulted and/or continue to result in the unlawful release of one or more PFCs into Plaintiffs' bodies and properties.

68.     The PFCs present on Plaintiffs' properties and in their bodies came from the Facility and were at all relevant times hereto, the property of Defendants.

69.     Plaintiffs never consented to the invasion and presence of the PFCs at Plaintiffs' properties and/or in their bodies.

70.     The presence of one or more PFCs in Plaintiffs' properties and/or bodies constitutes a continuing trespass.

13

71.     Defendants' past and continuing trespass upon Plaintiffs' properties and bodies has caused damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress and/or property damage, for which Defendants are liable, including liability for all appropriate medical monitoring of Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against Defendants jointly and severally, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VI - PAST AND CONTINUING BATTERY

72.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

73.     Defendants' intentional acts and omissions have resulted in the unlawful invasion, contact, and/or presence of one or more PFCs with or into Plaintiffs' bodies.

74.     Defendants' intentional acts and/or omissions were done with the knowledge that the contact of one or more PFCs with Plaintiffs' bodies were substantially certain to result.

75.     The PFCs that Plaintiffs have ingested, or that are present in the bodies of Plaintiffs, originating from the Facility were at all relevant times hereto, the property of Defendants.

76.     Plaintiffs never consented to the invasion, contact, or presence of one or more PFCs with Plaintiffs' bodies.

77.     The continuing presence of one or more PFCs in Plaintiffs' bodies constitutes a continuing battery.

14

78.     Defendants' past and continuing battery upon Plaintiffs' bodies caused damage to Plaintiffs in the form of bodily injury (including, but not limited to, blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress and other damage, for which Defendants are liable, including liability for appropriate medical monitoring of Plaintiffs.

WHEREFORE, each Plaintiff demands judgment in his or her favor and against defendants jointly and severally, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VII - MEDICAL MONITORING

79.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

80.     Each Plaintiff's water consumption has resulted in significant exposure to PFCs, relative to the general population.

81.     PFCs are proven hazardous substances, and are linked to human disease.

82.     Plaintiffs have been and will be significantly exposed to PFCs, including PFOA and PFNA, through the consumption of water from their well and have a significantly increased risk of contracting one or more serious, latent diseases, a risk they would not face in the absence of such exposure.

83.     The increased risk of serious latent disease described above makes it reasonably necessary for each plaintiff to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

84.     Monitoring procedures exist that make possible the early detection of the diseases referenced in the paragraphs above.

15

85.     Plaintiffs have no adequate remedy at law and, therefore, medical monitoring and the establishment of a medical monitoring fund are reasonably necessary to pay for medical care.

WHEREFORE, Plaintiffs demand the creation of a medical monitoring fund for each of them in an amount in excess of seventy-five thousand dollars ($75,000.00).

## COUNT VIII - STRICT LIABILITY

86.     Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

87.     Defendants knew or should have known that its release of one or more PFCs would create a high degree of risk of toxic exposure to the persons and/or property of Plaintiffs.

88.     Defendants' release of one or more PFCs is not a matter of common usage and created a significant likelihood that any harm would be substantial.

89.     Defendants' release of one or more PFCs occurred on and in close proximity to established residential neighborhoods and was not appropriate for the places where they were released.

90.     Defendants were aware that the release of one or more PFCs would likely contaminate drinking water sources and would thereby likely be consumed by Plaintiffs.

91.     Despite this awareness, Defendants conducted their operations at the Facility in a manner likely to cause harm to the Plaintiffs and are subject to strict liability for any and all damage their operations might cause.

92.     At all times relevant hereto, Plaintiffs have ingested or otherwise been exposed to one or more PFCs released from Defendants' facility which are present in their bodies.

16

WHEREFORE, each Plaintiff demands judgment in his or her favor and against defendants jointly and severally, and asks the Court to award each of them compensatory and punitive damages in an amount in excess of seventy-five thousand dollars ($75,000.00).

## V.    JURY DEMAND

The Plaintiffs demand trial by a jury on all of the triable issues of this complaint.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs have been damaged, and are entitled to damages in an amount to be proven at trial, in an aggregate amount to exceed the following relief:

1.    A judgment against Defendants that Defendants are liable to Plaintiffs for all harms resulting from Defendants' release of one or more PFCs from the Facility into the environment, including the well water of the Plaintiffs;

2.    A judgment against Defendants that Defendants are liable to Plaintiffs on the claim of private nuisance for all harms resulting from Defendants' release of one or more PFCs from the Facility into the environment, including the well water of the Plaintiffs;

3.    A judgment against Defendants that Defendants are liable to Plaintiffs  on the claim of past and continuing trespass for all harms resulting from Defendants' release of one or more PFCs from the Facility into the environment, including the well water of the Plaintiffs;

4.    A judgment against Defendants that Defendants are strictly liable for all harm to Plaintiffs;

5.    Compensatory and punitive damages in an amount to be determined at trial;

6.      The costs, disbursements and attorneys' fees of this action to the extent provided by law;

7.      Pre-judgment and post-judgment interest;

8.      Appropriate equitable and injunctive relief, including providing medical monitoring relief to the Plaintiffs, and to abate and/or prevent the release and/or threatened release of one or more PFCs, and to provide clean water; and

9.      For all other further and general relief, whether compensatory, equitable, or injunctive relief, as this Court may deem just and appropriate.

Respectfully submitted,

WILLIAMS CUKER BEREZOFSKY
**Mark R. Cuker, Esquire**
**Joseph Alan Venti, Esquire**
Woodland Falls Corporate Center
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002-1163
(856) 667-0500

CEDAR LAW FIRM
**David Cedar, Esquire**
1908 Marlton Pike East
Cherry Hill, NJ 08003
(856) 874-7500

***Attorneys for Plaintiffs***

By:   */s/ Mark R. Cuker*
         Mark R. Cuker, Esquire

18